# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                          Crim. No. 19-112 (MJD/BRT)

               Plaintiff,

v.

                                    **REPORT AND**
Jerry Leavale Hicks (1),                           **RECOMMENDATION**

               Defendant.

Benjamin Bejar, Esq., United States Attorney's Office, counsel for Plaintiff.

Douglas Olson, Esq., Office of the Federal Defender, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

       Defendant Jerry Leavale Hicks has been charged with five counts of Interference

with Commerce by Robbery and one count of Interference with Commerce by Attempted

Robbery in violation of 18 U.S.C. § 1951. (Doc. No. 14, Indictment.) The Indictment

alleges that Defendant committed a series of armed robberies of CVS Pharmacy stores in

the greater Minneapolis/St. Paul, Minnesota metro area between December 2018 and

February 2019. (*Id.*) Before the Court is Defendant's motion to suppress evidence

obtained from his residence, phones, and cars, as well as a DNA search and a search for

records; Defendant argues that evidence was seized pursuant to search warrants lacking

in probable cause. (*See* Doc. No. 33, Def.'s Mot. to Supp. Evidence 1.) Defendant also

moves to suppress all statements, admissions, and answers made by Defendant when

investigators questioned him at the time of his arrest, arguing that the interrogation was

not preceded by a complete *Miranda* warning and a knowing, intelligent waiver of those rights, and the statement was otherwise involuntary due to the circumstances of the encounter. (*See* Doc. No. 34, Def.'s Mot. to Supp. Statements, Admissions, and Answers 1.) The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.

On July 1, 2019, the undersigned held a hearing on Defendant's motions. (Doc. No. 38.) Defendant requested a four-corners review of the search warrants at issue, and the testimony from Special Agent Christopher Langert and exhibits were received.[1] (*See* Doc. Nos. 41, 44.) The parties requested post-hearing briefing on Defendant's motions to suppress, which were filed on July 29 and August 23, 2019. (Doc. Nos. 45, 48.) For the reasons stated below, this Court recommends that Defendant's motions be denied.

---

[1]     The six search warrants at issue, received as Plaintiff Hearing Exhibits, are as follows:

- Pl. Hr'g Ex. 1: 2/28/2019 Minnesota Search Warrant, Affidavit, and Application authorizing tracking of cellular phone location information
- Pl. Hr'g Ex. 2: 3/25/2019 Federal Search Warrant, Affidavit, and Application for Brooklyn Center residence and Dodge Caravan vehicle
- Pl. Hr'g Ex. 6: 5/24/2019 Federal Search Warrant, Affidavit, and Application for Galaxy cellular telephone with number 715-497-2039
- Pl. Hr'g Ex. 7: 5/24/2019 Federal Search Warrant, Affidavit, and Application for DNA sample from Jerry Leavale Hicks
- Pl. Hr'g Ex. 8: 5/24/2019 Federal Search Warrant, Affidavit, and Application for Mojio GPS device
- Pl. Hr'g Ex. 9: 6/10/2019 Federal Search Warrant, Affidavit, and Application for Minnesota Prescription Monitoring Program records

(*See* Doc. No. 41.)

## I.  Motion to Suppress Evidence

In his motion to suppress evidence, Defendant moves to suppress all physical evidence obtained as a result of the execution of six search warrants issued in this case based on lack of probable cause. In his post-hearing brief, Defendant also requests an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), with respect to the first two search warrants issued in this case because he asserts they contained erroneous information concerning a medical mask found after the robbery of a CVS in Brooklyn Center on January 15, 2019. Defendant argues that the first two warrants are "deficient and lack probable cause when the inaccurate information [about the mask] is purged from the initial warrants and that all evidence gathered . . . should be suppressed[, . . . that] the subsequent warrants are all tainted . . . and all evidence gathered pursuant to them should likewise be suppressed[, . . . and that] the brief statement taken from Mr. Hicks at the time of his arrest should also be suppressed." (Doc. No. 45, Def.'s Post Hr'g Mem. to Suppress Physical Evid. and Statements 2.)

### A.  *Franks* hearing

The first issue before this Court is whether Defendant has met his showing for a *Franks* hearing with respect to the first two search warrants. The affidavits in support of the first two search warrants both provide background information on each affiant officers' background and experience,[2] describe an ongoing investigation into several

---

[2]     Minneapolis Police Sgt. David Swierzewski was the affiant/applicant for the warrant for a cell tower tracking location ("the first warrant"). (*See* Pl. Hr'g Ex. 1.) FBI Agent Langert was the affiant/applicant for the warrant for Defendant's residence and vehicle ("the second warrant"). (*See* Pl. Hr'g Ex. 2.)

CVS drugstore robberies in the Twin Cities area, provide a general description of three CVS robberies that took place in late 2018 and early 2019, and provide a general description of the suspect (a heavy-set black male). (*See* Pl. Hr'g Exs. 1, 2.) Both warrant applications then contain slightly different information describing a medical mask allegedly dropped during the commission of the robbery that occurred on January 15, 2019, and found immediately after. (*See id.*) Defendant contends that because the information provided regarding the mask "contain material omissions and misrepresentations of facts which were made with reckless disregard for the truth and which undermine the finding of probable cause upon which the warrants were issued," a *Franks* hearing is warranted. (Doc. No. 45 at 10.)

The legality of a search may be subject to challenge even if conducted pursuant to a warrant. A defendant may challenge the veracity of the affidavit offered in support of probable cause. *See United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). "To warrant a hearing on the affidavit's veracity, the defendant must make 'a substantial showing that the affidavit contains intentional or reckless false statements and [that] the affidavit, [if] purged of its falsities, would not be sufficient to support a finding of probable cause.'" *Id.* (alterations in original) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997)) (citing *Franks*, 438 U.S. at 155–56; *see also United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004) (stating that a defendant seeking a *Franks* hearing must make a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of

probable cause") (quoting *Franks*, 438 U.S. at 155–56). The Eighth Circuit has "applied [the] rationale [of *Franks*] to cover material that has been deliberately or recklessly omitted from a search-warrant affidavit." *United States v. Jacobs*, 986 F.2d 1231, 1234 (8th Cir. 1993); *see also United States v. Wilson*, 324 F. App'x 546, 547–48 (8th Cir. 2009) (applying the two-part test for omissions). When challenging a warrant based on an omission, the defendant must show "'that the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading'" and that "'the affidavit[,] if supplemented by the omitted information[,] would not have been sufficient to support a finding of probable cause.'" *Jacobs*, 986 F.2d at 1234 (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).

The substantial showing required for a *Franks* hearing "is not easily made." *United States v. Engler*, 521 F.3d 965, 969 (8th Cir. 2008); *see also United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) ("The requirement of a substantial preliminary showing is not lightly met . . . ." (internal quotations and citation omitted)); *United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 1998) ("The 'substantial preliminary showing' requirement needed to obtain a *Franks* hearing is not lightly met."). A defendant must "offer specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). "A showing of negligence or innocent mistake is not enough to establish a *Franks* violation." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010). "A *Franks* hearing must be denied unless the defendant makes a strong initial showing of deliberate falsehood or reckless disregard of the truth." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010)

(internal quotations and citation omitted). If a defendant makes the substantial showing necessary to entitle him to a *Franks* hearing, he must then prove his allegations before the Court will suppress evidence. *Jacobs*, 986 F.2d at 1234. If the defendant establishes by a preponderance of the evidence "'the allegation of perjury or reckless disregard'" and, "'with the affidavit's false materials set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *Id.* (quoting *Franks*, 438 U.S. at 155–56).

In this matter, Defendant seeks a *Franks* hearing based on his assertion that the first two search warrants issued in this case contain inaccurate information regarding the discovery of a medical mask at the scene of a robbery (which later was determined to contain Defendant's DNA). Specifically, Defendant points to the following excerpts from the warrant applications, with the bolded information highlighting the information Defendant contends was not true. In the first warrant application (the February 2019 cell phone tracker warrant), Sgt. Swierzewski stated the following:

> On January 15th, 2019 at approximately 1922 hours in the City of Brooklyn Park (. . . Brooklyn Park, Hennepin County, MN) officers were dispatched to a report of a robbery of business at gunpoint at CVS Pharmacy. During the robbery a black male suspect entered the business, proceeded to the pharmacy area, jumped/climbed over a ½ door into the pharmacy area, with a handgun in his hand, demanded "Oxy" narcotics without Tylenol, and fled the area. **During the robbery the suspect wiped his forehead with a cloth type item which he dropped. The item was collected by police and held for forensic processing.** Suspect was described as a heavy set black male, approximately 5[']8" to 5'10" tall. Suspect was wearing a black jacket, grey scarf around his face, grey hat, black gloves, and black/dark shoes. The grey hat and mask may be a single piece.

. . . .

As part of the Task Force, Affiant has been investigating this series with Federal Partners. Affiant recovered and reviewed surveillance footage from the Minneapolis Robbery and saw the suspect approach from the North driving a dark colored Dodge Caravan. The suspect, wearing the same clothes as he is observed wearing when entering the business victim a short time later, parks his vehicle in view of multiple cameras, exits the vehicle, and removes the front and rear license plates to the vehicle before proceeding to the robbery. This is approximately 3-5 minutes prior to the suspect entering the business victim and attempting to rob the business as gunpoint. **The cloth type item that dropped and collected from the Brooklyn Park robbery** was sent to the Hennepin County Sheriff's Office Crime Lab (HCSOCL) for forensic analysis and testing. Affiant learned that a major male profile from this item was identified and forensically identified JERRY LEAVALE HICKS DOB: [. . .].

(Pl. Hr'g Ex. 1.) In the second warrant application (the March 2019 residence and van warrant), FBI Agent Langert stated the following:

9.    On January 15, 2019, at approximately 7:20 p.m., Brooklyn Park police officers responded to a reported armed robbery of a CVS Pharmacy, located [in] Brooklyn Park, Hennepin County, MN. During the robbery a black male suspect entered the business, proceeded to the pharmacy area, jumped/climbed over a half-door into the pharmacy area, and with a black and silver handgun in his hand, repeatedly demanded "oxy" narcotics without Tylenol. The suspect was described as a heavy set black male, approximately 5'08" to 5'10" tall, wearing a black jacket, grey scarf around his face, grey hat, (the grey scarf and hat may be a single piece), black gloves, and black/dark shoes. The suspect robbed the CVS at gunpoint of approximately 1300 oxycodone tablets of various dosages, approximately 350 tablets of various dosages of Methylphenidate, a Schedule III narcotic drug, and approximately 40 pills of Morphine, a Schedule II narcotic drug, and fled the area. **Surveillance footage showed the suspect carrying a small fabric medical face mask when he entered the store, and showed the suspect drop the medical face mask as he went over the half-door to the pharmacy area during the robbery. At one point, the suspect wiped his face with the medical face mask. This medical face mask was collected into evidence by the Brooklyn Park Police Department shortly after the robbery.**

. . . .

12.    The Hennepin County Sheriffs Office Crime Laboratory (HCSO Lab)
conducted forensic DNA testing on **the medical face mask the suspect
dropped** during the January 15, 2019, Brooklyn Park CVS robbery. The
HCSO Lab determined that the sole major DNA profile from the medical
face mask matched that of JERRY LEAVALE HICKS, YOB 1979.
According to DVS records, HICKS is a black male, reported to be 5'7" tall
and weighing 215 pounds.

(Pl. Hr'g Ex. 2.)

After these warrants issued and were executed, Special Agent Langert filed a

Declaration correcting misstatements that he had made through the above-referenced

affidavits (and in-court testimony) relating to the investigation of the January 15, 2019

robbery at the CVS store in Brooklyn Park. Specifically, he stated that the following

highlighted language from paragraph 9 in the second warrant was factually inaccurate:

Surveillance footage showed the suspect carrying a small fabric medical
face mask when he entered the store, and *showed the suspect drop the
medical face mask* as he went over the half-door to the pharmacy area
during the robbery. At one point, the suspect wiped his face with the
medical face mask. This medical face mask was collected into evidence by
the Brooklyn Park Police Department *shortly after the robbery*.

(Pl. Hr'g Ex. 3.) Special Agent Langert stated that he had "now learned that portions of

the foregoing statements were factually inaccurate in the following two ways":

8.    First, the portion of the statement that "[s]urveillance footage . . .
showed the suspect drop the medical face mask as he went over the half-
door to the pharmacy area during the robbery," and my testimony in this
regard, is not accurate. Upon further review of the surveillance footage, I
now believe that the suspect dropped a large piece of toilet paper, as he
went over the half-door and not the medical face mask that he was carrying.

9.    Second, the statement, "this medical face mask was collected into
evidence by the Brooklyn Park Police Department shortly after the
robbery," and my testimony in this regard, is not accurate. I have now

learned that the medical face mask was actually first collected by a store manager the morning after the robbery and then collected into evidence by the Brooklyn Park Police Department on January 17, 2019.

(*Id.*) Special Agent Langert explained the basis for the original statements made in the

affidavits as follows:

> 10.     . . . On January 22, 2019, as part of my investigation, I initially met with various local law enforcement investigators to discuss the series of then-four CVS robberies in the greater Minneapolis area. Upon discussing the January 15, 2019 Brooklyn Park CVS robbery, it was reported that the suspect had a piece of toilet paper that he wiped his face with and dropped during the robbery and that this item was recovered by the police. The lead Brooklyn Park Police Department (BPPD) detective assigned to the case stated that the item recovered was actually instead a child's medical face mask and that the recovered face mask had been submitted to the crime lab.
>
> 11.     A few days after this meeting, I received and reviewed some CVS surveillance videos from the January 15, 2019 Brooklyn Park robbery and noted in one video the suspect was carrying what appeared to be one or two medical face masks in his right hand and a brown paper bag in his left hand upon entering the store. In another video, I observed the suspect walking down a store aisle and using his right hand to touch his face with the medical face mask. In another video, I observed the suspect drop several items on the floor as he went over the half-door leading to the pharmacy area, including what appeared to me to be: a medicine bottle, a small box, a roll of toilet paper, the medical face mask, and the brown paper bag. That video showed the suspect pick up only the brown paper bag, but leave the remaining items behind on the floor. My review of these videos confirmed for me what I had learned during the investigators meeting on January 22, 2019, namely, that during the robbery the suspect had dropped a medical face mask that he had wiped his face with and it was recovered by the BPPD.

(*Id.*) Special Agent Langert then explained how he learned of the inaccurate statements:

> 12.     . . . On April 11, 2019, I was reviewing all police reports received related to the now-six armed robberies under investigation. Upon reviewing a BPPD report, authored by the same lead detective who was at the investigators meeting, I learned that a store manager, K.H., had collected the medical face mask from the floor by a garbage can near the front entrance; in other words, the medical face mask had not been recovered

directly by the BPPD as I had believed up to this point and stated in the prior Affidavits and in my testimony.

13.    The report also stated the BPPD collected the medical face mask on the morning of January 17, 2019, and not the evening of the robbery as I had believed up to this point and stated in the Affidavits and in my testimony. I then realized that if the information in the BPPD report was accurate, then I had made inaccurate statements in my three prior Affidavits and while testifying at the preliminary hearing on April 8, 2019.

14.    I immediately called the BPPD lead detective who authored the report and asked for an explanation. The BPPD lead detective confirmed that the information in the report was accurate.

(*Id.*) It was during this phone conversation with the BPPD lead detective that Special Agent Langert also "realized that the medical face mask could not have been among the several items [he] had viewed the suspect drop in one of the videos as he went over the half-door leading to the pharmacy area, as [Special Agent Langert] believed up to this point and had stated in the Affidavits and in [his] testimony." (*Id.* ¶ 16.) After this phone conversation, Special Agent Langert reviewed the surveillance video again, and "[h]aving learned that the medical face mask had been collected elsewhere, [he] now believe[d] the item the suspect dropped, which [he] originally thought was the medical face mask, was in fact a piece of toilet paper." (*Id.* ¶ 17.)

The question before this Court when determining whether a *Franks* hearing is merited is whether Defendant has made a substantial showing that the inaccurate statements made in the first two search warrant affidavits[3] were made deliberately or

---

[3]    Arguably, the statements made in the first warrant were not inaccurate, as they did not indicate when the item was dropped, where it was dropped, or when it was collected – the first statement being, "During the robbery the suspect wiped his forehead with a cloth

(Footnote Continued on Next Page)

recklessly. *See Franks*, 438 U.S. at 165. This Court concludes Defendant has not made this substantial showing.[4] In his brief, Defendant only cites to the inaccurate statements made. He makes no attempt to show that the inaccurate statements were made intentionally or recklessly, other than pointing to Special Agent Langert's Declaration. (*See* Doc. No. 45 at 11.) There is no evidence showing that the officers intentionally included the inaccurate statements in the affidavits in support of the warrants knowing that the statements were false. Instead, Special Agent Langert's Declaration states that at the time he made the statements in the affidavit, he thought them to be true based on the reports he had been given. "[S]earch warrants need not always be literally true in order to be valid[,] given investigative time constraints and officers' reliance on hearsay information." *United States v. Clapp*, 46 F.3d 795, 800 (8th Cir. 1995). While "the

---

type item which he dropped. The item was collected by police and held for forensic processing"; and the second statement being, "The cloth type item that dropped and collected from the Brooklyn Park robbery was sent to the Hennepin County Sheriff's Office Crime Lab (HCSOCL) for forensic analysis and testing." (Pl. Hr'g Ex. 1.)

[4]    The Government argues that Defendant has not presented evidence in the form of an affidavit or otherwise to corroborate his assertions. "A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing." *United States v. El-Alamin*, 574 F.3d 915, 925 (8th Cir. 2009) (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998)) (citing *Franks*, 438 U.S. at 171); *see also Gonzalez*, 781 F.3d at 430 (stating that a defendant must "offer specific allegations along with supporting affidavits or similarly reliable statements"). Defendant contends that the Declaration of Special Agent Langert received as Exhibit 3 at the hearing is sufficient to meet his offer-of-proof burden. And even if it were not sufficient on its own, Defendant filed an affidavit by his counsel attached to a Reply brief. (Doc. No. 49, Attach. 1.) As further explained herein, even considering both the Declaration of Special Agent Langert and the Affidavit from Defendant's counsel, Defendant's request for a *Franks* hearing should be denied.

affidavit must contain statements that are truthful[,] . . . '[t]his does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct. . . . But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.'" *United States v. Schmitz*, 181 F.3d 981, 985–86 (8th Cir. 1999) (quoting *Franks*, 438 U.S. at 165). Here, Special Agent Langert thought the statements he was making were true at the time that he was making them, and Defendant has provided no evidence to the contrary.

The next question is whether the officers' statements were made with reckless disregard for the truth. In determining if "an affiant's statements were made with reckless disregard for the truth," the test "is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011) (citation omitted); *see also Clapp*, 46 F.3d at 800 (stating that when considering whether an affiant's statement is made with "reckless disregard for the truth," courts "look[] to what the affiant 'believed or appropriately accepted' as true") (citation omitted). Here, there is no evidence that the officers recklessly disregarded the truth. Special Agent Langert, for example, was making averments based on reports from other officers that he believed to be true and based on a reasonable interpretation (in light of what he had been told) of what he believed he was

viewing on the surveillance video.[5] His incorrect interpretation of the surveillance video and reliance on what other officers told him was at most "negligence or [an] innocent mistake" which "is not enough to establish a *Franks* violation." *Butler*, 594 F.3d at 961; *see also United States v. Kattaria*, 553 F.3d 1171, 1177 (8th Cir. 2009) (affirming denial of a *Franks* motion where the defendant "offered no reason to believe that the information in the affidavits was a deliberate or reckless falsehood" and finding that even if the "affidavit[] was inaccurate as to timing, the discrepancy is not particularly significant"); *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (affirming denial of a *Franks* hearing because even assuming defendants sufficiently showed a falsehood, defendants "totally failed to demonstrate that [falsehood] was made deliberately or recklessly").

Even if the mistake was reckless, the request for a *Franks* hearing should nevertheless be denied for failure to meet the final requirement, which is when purged of the false statements, the remaining statements in the affidavits would not be sufficient to support a finding of probable cause. *See United States v. Scott*, 610 F.3d 1009, 1013 (8th Cir. 2010) (stating that even assuming information was intentionally or recklessly omitted from the search warrant affidavits, "'[s]uch a finding alone is legally insufficient to justify a *Franks* hearing absent a determination that the intentionally or recklessly

---

[5]    Defendant asserts that the surveillance video was "unambiguous." (Doc. No. 45 at 12.) The surveillance video was not offered as an exhibit at the motions hearing or otherwise submitted in connection with the pending motion. Even if it were, however, the relevant question is what Special Agent Langert believed he saw on the video.

(Footnote Continued on Next Page)

omitted information may have . . . otherwise made a probable cause finding unsupportable.'" (quoting *United States v. Williams*, 477 F.3d 554, 558 (8th Cir. 2007))). Here, the remaining statements provided probable cause.[6]

First, when removing the references to the medical mask being dropped by the suspect and the mask being recovered shortly after the robbery, the statements that "[s]urveillance footage showed the suspect carrying a small fabric medical facemask when he entered the store," that "[a]t one point, the suspect wiped his face with the medical facemask," that "[t]his medical facemask was collected into evidence by the Brooklyn park Police Department," and that "[t]he HCSO Lab determined that the sole major DNA profile from the medical facemask matched that of [Defendant]" remain. (Pl. Hr'g Ex. 2, ¶ 9.) Those statements were true and provide information for a judicial officer to consider. Second, even when removing all statements regarding the medical mask from the affidavits, there remain statements supporting a probable cause finding. Defendant does not address the remaining statements in the affidavits and instead focuses solely on the statements in the affidavits relating to the medical mask. (*See* Doc. No. 45 at 12–13.) But other information in the affidavits also provide for "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The

---

[6]    This Court notes that because it finds the evidence does not support that the inaccurate statements were made intentionally or recklessly, the analysis could end here with respect to Defendant's request for a *Franks* hearing. *See United States v. Finley*, 612 F.3d 998, 1003 (8th Cir. 2010) (declining to consider whether remaining facts in the affidavit were sufficient to establish probable cause where defendant made "no showing of a deliberate or reckless falsehood").

standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (internal quotations and citation omitted)). For example, both affidavits reference:

- a series of CVS Pharmacy robberies occurring within a two-month period and within the Minneapolis/St. Paul, Minnesota metro area;

- that the robberies were all carried out in similar manners;

- that after the February 4, 2019 robbery, the suspect was followed into the parking lot and was seen getting into a dark colored Dodge Caravan with no license plates;

- that surveillance footage from the February 4, 2019 robbery shows the suspect "wearing the same clothes as he is observed wearing when entering the [CVS] a short time later, park[] [the dark colored Dodge Caravan] in view of multiple cameras, exits the vehicle, and remove[] the front and rear license plates [from the Dodge Caravan] before proceeding to the [CVS that was robbed] … [which was] approximately [3 to 5] minutes prior to the suspect enter[ed] the [CVS] and attempt[ed] to rob the business at gunpoint" (Pl. Hr'g Exs. 1, 2.); and

- that during the December 12, 2018 incident, one of the suspects was seen appearing to communicate on a cell phone, and data received indicated that the target phone number—which investigation had revealed was the number used by Defendant—was in the area of the business at the time of the robbery.

(Pl. Hr'g Exs. 1, 2.) In addition, the second affidavit indicates that Defendant rented a white Buick Encore from December 27 to 30, 2018, which appeared through viewing images to be the same vehicle used during the December 27, 2018 CVS robbery in Rogers, MN; Defendant rented a blue Nissan Murano from December 30, 2018 through January 3, 2019, which appeared through viewing images to be the same vehicle used during the January 2, 2019 CVS robbery in Bloomington, MN; and Defendant is the registered owner of a dark gray Dodge Caravan and was observed on surveillance video

driving such a vehicle one month after the February 4, 2019 CVS robbery in

Minneapolis, MN. Because reviewing these statements in the affidavits together under

the totality of the circumstances provided probable cause (even without the statements

relating to the medical mask), this Court concludes that Defendant has not established

that the inaccurate statements were necessary to the finding of probable cause and

recommends that Defendant's request for a *Franks* hearing be denied.

### B. Probable Cause for the Remaining Four Search Warrants

Defendant argues that the remaining four warrants (Pl. Hr'g Exs. 6–9), are all fruit

of the illegal warrants issued and executed in this case. (Doc. No. 45 at 13–14.) As

explained above, the first two warrants are valid warrants supported by probable cause.

Therefore, Defendant's argument fails. Defendant also asserts that the remaining four

warrants are "deficient in probable cause because the mask was not dropped by the

robbery suspect at the scene." (*Id.* at 14.) Defendant makes no other argument as to the

remaining information provided in the search warrants and whether the other information

provides probable cause.

This Court has reviewed all four of the remaining search warrants at issue and

concludes that the warrants were based on sufficient probable cause. Under the Fourth

Amendment, a search warrant must be supported by a showing of probable cause, which

exists when the supporting affidavit "sets forth sufficient facts to establish 'a fair

probability that contraband or evidence of a crime will be found in a particular place.'"

*United States v. Darr*, 661 F.3d 375, 380 (8th Cir. 2011) (quoting *Illinois v. Gates*, 462

U.S. 213, 238 (1983)). The task of a judge issuing a search warrant "is simply to make a

practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," such a fair probability exists. *Gates*, 462 U.S. at 238. As a reviewing court, this Court defers "to the probable cause determinations of the issuing judge" unless the judge lacked "a substantial basis for concluding that probable cause existed." *United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004). "When . . . the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003) (quotations omitted). Also, courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

After reviewing the search warrants and supporting affidavits in a practical, common-sense manner, and considering the circumstances of the investigation of the series of robberies as a whole, this Court concludes that each of the supporting affidavits establish probable cause because they showed there was a fair probability that evidence of the robberies, including identification evidence, would be found in a particular place or through a particular means (*i.e.*, on Defendant's cell phone, in Defendant's DNA sample, on a GPS tracking device, in records within the Minnesota Prescription Monitoring Program). *See Illinois v. Gates*, 462 U.S. at 238. Further, this Court is satisfied that the

17

warrants here meet the requirements under the Fourth Amendment and the good faith

exception enunciated in *United States v. Leon*, 468 U.S. 897 (1984).[7]  Therefore, this

Court recommends that Defendant's motion to suppress evidence be denied.

## II. Motion to Suppress Statements

FBI Special Agent Langert testified that on the morning of April 4, 2019, he and

other agents arrested Defendant at his residence in Brooklyn Center pursuant to a federal

arrest warrant. (Doc. No. 44, Hr'g Tr. 15.) The officers were also there to execute a

federal search warrant for Defendant's home and vehicle. (*Id.*) When the agents executed

the warrants, in addition to the Defendant, there were two juvenile females at the

residence, who were identified as the biological children of Defendant's long-time

girlfriend who also lived at the residence. (*Id.* at 15–16.) Special Agent Langert explained

to Defendant as he was taken into custody that they were executing a federal search

warrant and that they would be in the home for quite some time. (*Id.* at 17.) Langert

asked Defendant what they should do with the two juvenile females. (*Id.*) Defendant

---

[7]    Under *United States v. Leon*, 468 U.S. 897 (1984), "disputed evidence will be
admitted if it was objectively reasonable for the officer executing [the] search warrant to
have relied in good faith on the [issuing] judge's determination that there was probable
cause to issue the warrant." *United States v. Hager*, 710 F.3d 830, 837 (8th Cir. 2013)
(quotations omitted). "The good-faith inquiry is confined to the objectively ascertainable
question whether a reasonably well trained officer would have known that the search was
illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427,
430 (8th Cir. 2007) (quotations omitted) (alteration in original). Here, this Court
concludes that the good-faith exception applies. There is no evidence to suggest that the
officers' reliance on the warrants was not in good faith, nor is there evidence that the
officers' reliance was not reasonable. For these reasons, this Court concludes that the
evidence seized as a result of the execution of the search warrants need not be
suppressed.

requested that Special Agent Langert first contact his girlfriend, and if he could not reach

her, to contact his girlfriend's sister to make arrangements for the girls. (*Id.*) Special

Agent Langert asked Defendant for their contact information. (*Id.*) Defendant responded

that the contact information could be found on his phone (a white iPhone) in his

bedroom. (*Id.*) The agents then brought out a white iPhone that they found in the

bedroom, showed it to Defendant, and Defendant told them that it was his phone and that

it was the phone that held the contact information that he wanted to provide. (*Id.*; *see also*

*id.* at 25.) Special Agent Langert asked Defendant for the passcode for his phone;

Defendant gave it to him and guided Langert through his contacts to point him to the

phone numbers for his girlfriend and his girlfriend's sister. (Tr. 18, 26.) Special Agent

Langert was able to contact the sister and they made arrangements for adults to come and

pick up the two children. (*Id.* at 18.) While at the residence, Special Agent Langert did

not ask Defendant any questions related to the robbery charge, nor did he do any other

searching on Defendant's phone. (*Id.* at 19, 26.) The only other questions asked of

Defendant were what Special Agent Langert characterized as "administrative comments

about getting clothes on him, moving him about"; but no questions were asked related to

the investigation. (*Id.*) The juvenile females were eventually picked up, and Defendant

was taken to the FBI building in Brooklyn Center. (*Id.* at 19.)

    In his motion to suppress statements, Defendant contends that the questions asked

by law enforcement during his arrest at his home were the functional equivalent of

custodial interrogation without a *Miranda* warning and were otherwise involuntary. (Doc.

No. 34.) Defendant has cited no legal authority to support his argument. Instead, he only

makes a one-line argument in his brief: "[T]he statements and discussions surrounding the juveniles, the identification of the cell phone and the passcode, should be suppressed because Mr. Hicks was in custody, he was asked questions, and he had not been read his Miranda rights." [8] (Doc. No. 45 at 15.)

To use a defendant's statements made during a custodial interrogation against him at trial, government agents must provide a *Miranda* warning prior to questioning. The warning must inform a defendant that he has the right to remain silent, that anything he does say can be used against him as evidence, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). These warnings need not follow a precise formulation, and the "inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quotations and alterations removed).

A custodial interrogation that triggers the need for *Miranda* warnings is one that involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

---

[8]    In his post-hearing brief, Defendant also made a one-line statement indicating that he seeks to suppress the statements he made during his Mirandized interview at the FBI as "fruits of his unlawful arrest on a complaint and warrant that lacked probable cause, as noted in the above discussion concerning the search warrants." (Doc. No. 45 at 15–16.) Because the search warrants at issue all were supported by probable cause as explained above, Defendant's fruit-of-the-poisonous tree argument fails. Further, the questioning of Defendant at the FBI building was preceded by both an oral and written *Miranda* advisory of rights form, which he signed and agreed to speak with the officers. (Tr. 19–21; *see also* Pl. Hr'g Exs. 4, 5.)

*Miranda*, 384 U.S. at 444. When analyzing whether a particular defendant was in custody at the time of an interrogation, "the ultimate inquiry is simply whether there [was] . . . restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted); *see also United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) ("To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest.") (quotations omitted).

To trigger the protections of *Miranda*, an individual must also be subjected to "interrogation." Interrogation refers to "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. And it is defined as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980); *see also Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (stating that custodial interrogation for purposes of *Miranda* includes both express questioning and words or actions that are "reasonably likely to elicit an incriminating response"). Here, it is undisputed that Defendant was in custody. The question before the Court is whether Defendant was subjected to interrogation.

Not every police question constitutes interrogation requiring a *Miranda* warning. *United States v. McLaughlin*, 777 F.2d 388, 391–92 (8th Cir. 1985); *see also United*

*States v. Sims*, 719 F.2d 375, 378–79 (11th Cir. 1983) (holding that a government agent's asking a detainee's address and telephone number for non-interrogative identification purposes does not require a *Miranda* warning). Information necessary for basic identification purposes provided in a post-arrest interview is not the product of interrogation, even if the information is incriminating, unless the government agent should reasonably be aware that the information he seeks is directly relevant to the substantive offense. *McLaughlin*, 777 F.2d at 391–92. If the questions go beyond routine processing questions, a suspect has a right to receive *Miranda* warnings. *Cf. United States v. Reyes*, 908 F.2d 281, 287–88 (8th Cir. 1990) ("We further note that [defendant] did not have a right to be read the *Miranda* warnings only to the extent [the officer] asked him routine processing-type questions such as [his] name, address, or related matters.").

Here, Special Agent Langert asked Defendant what they should do with the two juvenile females that were present at Defendant's home at the time of his arrest. After Defendant requested that Special Agent Langert contact his girlfriend or his girlfriend's sister to make arrangements for the girls to be picked up, Special Agent Langert asked Defendant for their contact information. When Defendant stated that the contact information could be found on his phone in his bedroom, Special Agent Langert asked Defendant for the passcode for his phone. These questions and their responses fall within the *Miranda* exception for basic identification information. There is no evidence that Special Agent Langert designed them to elicit incriminatory responses or admissions. Instead, the questions involved matters necessarily attendant to his arrest and therefore

did not constitute custodial "interrogation."[9] *See Lopez v. County of Los Angeles*, No. 15-cv-03804-TEH, 2016 WL 54123, at *6 (N.D. Cal. Jan. 5, 2016 ) (stating that asking to "hand over his keys and for the password to his cell phone" were "attendant to arrest and custody, and thus do not serve as functional equivalents of interrogation"). Because Defendant's *Miranda* rights were not violated, Defendant's motion to suppress should be denied.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 33) be **DENIED**;

2.      Defendant's Motion to Suppress Statements, Admissions, and Answers (Doc. No. 34) be **DENIED**.

Date:  September 16, 2019                    *s/ Becky R. Thorson*          _
                                             BECKY R. THORSON
                                             United States Magistrate Judge

---

[9]      There is also no evidence showing that Defendant's answers were involuntary.

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **September 30, 2019**. A party may respond to those objections by **October 15, 2019**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.

**Transcript:** Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.